Filed 3/13/24  P. v. Sanchez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN GIL SANCHEZ,<br><br>    Defendant and Appellant. | F084260<br><br>(Super. Ct. No. BF185060A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Appellant.

-ooOoo-

On March 27, 2021, defendant John Gil Sanchez shot and killed Jeffrey Correll. On April 5, 2022, Sanchez was convicted by a jury of second degree murder. Additionally, the jury found true that Sanchez personally and intentionally discharged a firearm proximately causing the death of Correll, and the trial court found that Sanchez had a prior strike conviction within the meaning of the Three Strikes law (Pen. Code,[1] §§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)) and a prior serious felony conviction. Sanchez was also convicted of two other offenses. On appeal, Sanchez argues that the trial court erred in admitting inflammatory evidence that had little to no relevance. Sanchez further argues that the trial court abused its discretion in declining to dismiss the enhancements and the strike prior. The People disagree. We affirm.

## PROCEDURAL HISTORY

On May 4, 2021, the Kern County District Attorney filed an information charging Sanchez with first degree murder (§§ 187, subd. (a), 189; count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and misdemeanor possession of controlled substance paraphernalia (Health & Saf. Code, § 11364; count 3). As to count 1, the information alleged that Sanchez personally and intentionally discharged a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d)) and had a prior serious felony conviction (§ 667, subd. (a)). As to both counts 1 and 2, the information alleged that Sanchez suffered a prior strike conviction (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)). On March 2, 2022, the information was amended to add aggravating factors to both counts 1 and 2.[2]

On March 16, 2022, during trial, Sanchez pled no contest to count 3. On April 5, 2022, Sanchez was found not guilty of first degree murder, but guilty of second degree

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

[2] The amended information is not part of the record on appeal.

2.

murder on count 1, and possession of a firearm by a felon on count 2. As to count 1, the jury found true that Sanchez personally and intentionally discharged a firearm proximately causing the death of Jeffrey Correll. On that same day, after a bifurcated trial on factors in aggravation, the jury found three aggravating factors true. Additionally, the trial court found that Sanchez had a prior strike conviction and a prior serious felony conviction.

Sanchez was sentenced on April 22, 2022. The trial court denied Sanchez's oral motions to strike the firearm enhancement, the prior strike conviction allegation, and the prior serious felony conviction enhancement. As to count 1, Sanchez was sentenced to 30 years to life (the sentence was doubled due to the prior strike conviction), plus 25 years to life for the firearm enhancement, plus five years for the prior serious felony conviction; as to count 2, Sanchez was sentenced to the upper term of six years (the sentence was doubled due to the prior strike conviction), stayed pursuant to section 654; and as to count 3, Sanchez was sentenced to 180 days in jail, to be served concurrently with the sentence on count 1.

On April 22, 2022, Sanchez filed a timely notice of appeal.

## FACTUAL SUMMARY

*The Prosecution's Case*

On March 27, 2021, N.S. was driving southbound at approximately midnight. When he approached an intersection, there was a black vehicle in front of him and a second black vehicle stopped behind him. There was an altercation between the people in the two black vehicles. Sanchez was driving the first black vehicle. Sanchez had his hand hanging out the window and was saying things to a man in the second black vehicle. Someone in one of the black vehicles was yelling, but N.S. could not tell who.[3]

---

[3] On the night of the incident N.S. stated that someone in the second black vehicle was yelling at the black vehicle in front of him.

3.

As all three vehicles were stopped at the red light, N.S. saw Sanchez accelerate, do a donut in the middle of the intersection, and then go to the west side of the intersection, facing east. The light turned green for Sanchez's vehicle, and Sanchez went through the intersection and parked just past a gas station. Sanchez then shut off all the lights on his vehicle.

When the southbound light turned green, the second black vehicle turned left and then pulled into the gas station. Because of this, and because of the way Sanchez parked, N.S. "could tell something was going to happen."

Sanchez and Jeffrey Correll, a passenger in the second black vehicle, approached each other. Sanchez pointed a gun at Correll and fired several shots. Video footage of the incident taken by cameras at the gas station showed that Sanchez got out of his parked vehicle and started walking towards the gas station. Approximately 15 seconds later the second black vehicle pulled into the gas station, Correll got out of the vehicle before it came to a complete stop, and Correll started walking toward Sanchez. Once the vehicle stopped, the driver also got out and started walking towards Sanchez. Sanchez stopped and let them approach while he appears to have argued with Correll.[4] It appears that Correll eventually stopped walking towards Sanchez (the view of Correll was blocked by a pillar). Approximately five seconds later Sanchez pulled a gun from his waistband and shot at Correll (the view of Correll was still blocked by a pillar).

When law enforcement arrived at the gas station, Correll was on his back. He had a gunshot wound and was pronounced dead at the scene. The bullet entered "the back right side of the head, four inches from the right ear canal and located at 10:00 if one sees the right side of the head as if it were a clock face." The bullet exited "at the left side of the neck … a little bit more towards the back of the neck than towards the front of the neck." The bullet "traveled to the left, downward and a bit forward, hitting at the right

---

[4] The video footage does not have audio.

4.

back of the head, going through the head and the brain, and then coming out the lower part of the head out of the neck."

Law enforcement found a knife in Correll's pocket that was still in its sheath.

After Sanchez shot Correll, Sanchez ran back to his vehicle and drove away at a high rate of speed. A police officer, who received a report to be on the lookout for a vehicle matching the make and model of Sanchez's vehicle, spotted Sanchez's vehicle and initiated a traffic stop. After the police vehicle's emergency lights were activated, an object was thrown out of the driver's side window of Sanchez's vehicle. A police officer was able to locate the object. It was the firearm that was used in the shooting at the gas station.

S.C., a minor, was a passenger in Sanchez's vehicle during the incident at the gas station and at the time Sanchez was pulled over by the police. At that time, Sanchez was S.C.'s friend (sometime after Sanchez was arrested on March 27, 2021, Sanchez became S.C.'s boyfriend). Before stopping at the gas station, she and Sanchez were stopped at a light. S.C. and Sanchez were quiet, but there was yelling coming from another vehicle. Sanchez did a circle and then parked by the gas station. At that time, S.C. was in the vehicle looking at her phone. She did not see Sanchez while he was outside of the vehicle. At some point S.C. heard gunshots and looked toward the sound of the gunshots. Sanchez ran back to the vehicle and drove away from the gas station. Sanchez drove at a normal speed. Eventually, while Sanchez and S.C. were still in the vehicle, S.C. saw police lights and threw the firearm out the window.

After Sanchez was arrested, he spoke with S.C. on the phone around 1000 times. Numerous calls were played for the jury. In one of the calls, Sanchez told S.C. that they were never at, or close to, the gas station. In multiple calls Sanchez told S.C. not to go to

5.

court, sometimes using "code."[5]  In another call, Sanchez told S.C. to leave the area because the district attorney's office knew where to find her.

S.C. ran away from home after she received an order to go to court because Sanchez told her not to go, because she did not want to testify against Sanchez, and because her father was going to make her go to court.  However, after the trial started Sanchez called S.C., told her that her testimony was going to be admitted even if she did not go, and told her to go to court.

### Sanchez's Case

Sanchez testified on his own behalf.  On March 27, 2021, at some point shortly after midnight, Sanchez left his apartment to pick up S.C.  S.C. was a friend.

While Sanchez was driving S.C. home, he stopped at a major intersection.  While he was stopped, a vehicle behind Sanchez flickered its lights.  At this time, Sanchez thought he was in an altercation with the other vehicle.  Sanchez and the other vehicle both made a right turn, and the other vehicle was still behind Sanchez.

Sanchez stopped at another intersection.  After Sanchez stopped, the vehicle behind him honked and someone inside that vehicle made a derogatory comment.  Sanchez made a left turn and then moved to the right lane so that the vehicle could pass him.  However, the vehicle stayed behind him.

Sanchez next stopped at the intersection near the gas station.  At the intersection, Sanchez immediately turned right and made a U-turn.  Sanchez made this maneuver because he heard someone in the other vehicle say, "what's up, b***h," and he wanted to see who was in the vehicle; because he did not want to be near the vehicle; and because he was deciding if he wanted to follow the vehicle.  Sanchez did not say anything in

---

**5** Sanchez and S.C. sometimes used a "code" where Sanchez would say one thing but mean the opposite.

response, and he was not attempting to follow the vehicle. After Sanchez made the maneuver, someone in the other vehicle said, "p***y."

At this time Sanchez was watching the other vehicle. The light was green for that vehicle, but it did not move forward. Sanchez was concerned for his safety because he thought that the vehicle was following him. Sanchez did not intend to, nor did he, get behind or chase this vehicle.

Sanchez went through the intersection and stopped just past the gas station. Sanchez pulled over because he "noticed that it was just going to be a cat and mouse game." At this time, the other vehicle was still stopped at the intersection.

Sanchez then got out of his vehicle to look for his phone and to see what was going on. He had a gun inside of his tights on his waist. Sanchez carried a gun because he had bad experiences where he lived and because his job required it.

Sanchez started walking towards the gas station to see if he was being followed and to put distance between himself and his vehicle. Sanchez was confused and alert.

The other vehicle pulled into the gas station. Correll got out before it stopped moving and headed toward Sanchez. Correll looked determined and mad. Another man also got out and headed toward Sanchez. Sanchez stopped and both men continued to move towards him.

Correll said to Sanchez, "you ready, b***h." Sanchez looked at the man behind Correll and told him to get his "homie." Sanchez said this because Correll was coming towards Sanchez, and he appeared to be drunk. Sanchez thought Correll might be irrational because he was intoxicated.

Correll stopped and had his right hand in his right pocket. The other man continued to walk towards Sanchez. The men did not want to talk, and Sanchez feared for his life because he thought that Correll may have a gun.

Correll's hand started to leave his pocket. Sanchez did not see the full weapon, but he saw Correll holding a handle in his pocket, thought that Correll had a gun, and

7.

thought that he was going to get shot. So, without thinking or weighing his options, Sanchez pulled out his firearm and fired three shots.

Sanchez was scared, so he ran towards his vehicle and fled.

A toxicologist testified. While there is individual variability, certain behaviors are associated with an increased concentration of alcohol, including loss of critical judgment, mental confusion, and an exaggerated response to emotional states. Correll had a blood alcohol concentration of 0.184. This was a significant level. Additionally, Correll had buprenorphine in his system. An individual who takes buprenorphine with alcohol experiences more intense effects than an individual who just takes alcohol.

A psychologist testified regarding the "fight-or-flight" response. When individuals fear for their lives, this response is triggered. Signs that this response has been triggered can include heightened emotions, body trembling, sweating, dilated pupils, difficulty gathering thoughts, difficulty communicating, and rapid breathing.

### The Prosecution's Rebuttal

A sheriff's deputy saw Sanchez less than 10 minutes after receiving a call regarding shots being fired. Sanchez appeared very calm and very collected. He was not shaking, sweating, trembling, or breathing extra hard. Additionally, Sanchez did not have any difficulty answering the deputy's questions, communicating with the deputy, or following the deputy's instructions.

## DISCUSSION

Sanchez argues that the trial court erred in admitting inflammatory evidence that had little to no relevance. Specifically, Sanchez argues it was error to admit Sanchez's repeated use of the "N word," to admit Sanchez's statement that he had served a prior prison term, to allow questions related to the sexual relationship between Sanchez and S.C., and to admit Sanchez's derogatory references to his mother. Sanchez further argues that these errors were prejudicial as to his murder conviction.

Finally, Sanchez argues that the trial court abused its discretion in declining to dismiss the strike prior and the enhancements.

We address each argument in turn.

## I.     The Trial Court Did Not Err in Admitting the Purportedly Inflammatory Evidence and Any Assumed Error Was Harmless

Sanchez argues the trial court erred in admitting evidence of his use of the "N word," his statement that he had served a prior prison term, the fact of his sexual relationship with a minor, and his derogatory statements about his mother.  The People disagree.  We conclude:  admission of the first two categories of evidence was not error; even if admission of the second two categories of evidence was error, it was harmless.

### A.  *Applicable Law and Standard of Review*

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

Relevant evidence can be excluded pursuant to Evidence Code section 352.  This section " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect.  " ' "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 948.)

" ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice." ' " (*People v.*

*Doolin* (2009) 45 Cal.4th 390, 438.) " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*Id*. at p. 439.)

"An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

We assess whether a defendant was prejudiced by the admission of irrelevant evidence in violation of state evidentiary rules under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Benavides* (2005) 35 Cal.4th 69, 91.) Pursuant to *Watson*, a "miscarriage of justice" is shown where it appears "reasonably probable" that the defendant would have achieved a more favorable result had the error not occurred.[6] (*Watson*, *supra*, 46 Cal.2d at p. 836.)

---

[6] Sanchez argues the alleged errors trigger review under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). He claims the errors violated his federal constitutional rights to due process and to a fair trial. *Chapman* review does not apply here because the errors complained of concern the application of state evidentiary law, and Sanchez fails to show that any of the alleged errors, either separately or cumulatively, rendered his trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"].)

## B. Analysis

### i. It Was Not Error to Admit Sanchez's Repeated Use of the "N word"

At trial, Sanchez's counsel argued that the jail calls contained "gratuitous use of the N word," and asked that Sanchez's use of the word be redacted. As to use of the "N word" ending with an "a," the prosecutor argued that Sanchez regularly addressed S.C. using this word, so "to take that out would literally essentially wreck the entire call." Additionally, the prosecutor argued that when the word was used in this way, it was not being used in a derogatory manner.

The trial court granted Sanchez's request in part. The trial court found that, "in today's day and time, we've all heard now a lot of these types of conversations, that the N word that ends with A is very often bantered back and forth and not in a derogatory way. The N word ending with ER is typically derogatory." Thus, the trial court ordered that only the "N word" ending with "er" be redacted.

On appeal, Sanchez argues that this was error because "[i]t is not certain or even likely the average juror would take such a detached view of the N[ ]word as the court did. It is reasonably likely a juror would consider the use of the word to be racist, even when not directed to specific person. The consistent use of the word in conversation is offensive to most people."[7]

However, our Supreme Court has held that "racial epithets [are] not so inflammatory that their probative value [is] substantially outweighed by their potential for undue prejudice. [Citation.] The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant." (*People v. Quartermain* (1997) 16 Cal.4th 600, 628 (*Quartermain*).) Thus, the use of racial epithets can be admitted even when used in a

---

[7] Sanchez does not argue that the jail calls were irrelevant as a whole.

derogatory manner. Despite this, the trial court in this case ordered redactions in the instances defendant used the "N word" ending with "er," because it is "typically derogatory." Additionally, Sanchez does not point to any specific instance where the "N word" was used in a derogatory way but not redacted. Given *Quartermain* and the redactions ordered by the trial court, the trial court did not abuse its discretion in admitting the calls without ordering redaction of the "N word" ending in "a" over Sanchez's Evidence Code section 352 objection.

Sanchez does attempt to distinguish *Quartermain* by arguing that the evidence of racial epithets had relevance in *Quartermain*, whereas here there was no relevance. Sanchez is correct that in this case there was not any relevance in the use of the word itself. Unlike in *Quartermain*, it was not used to show enmity toward the victim. However, the prosecutor argued, and the trial court appears to have agreed, that redacting the "N word" every time Sanchez used it would "essentially wreck the entire call." Thus, there was a legitimate reason to allow the word to be left in the calls, because if it was not, relevant evidence would no longer be coherent.

Given the trial court's broad discretion under Evidence Code section 352, and our Supreme Court's holding in *Quartermain*, we find no abuse of discretion.[8]

### ii. It Was Not Error to Admit Sanchez's Statement That He Had Served a Prior Prison Term

On appeal, Sanchez argues that a reference to a prior prison term that he made in one of the jail calls should have been redacted because it was not relevant. "The context of the statement was [Sanchez's] effort to dissuade [S.C.] from testifying, but the gist of that effort was clear without reference to the prison term." The People argue that this error is not cognizable on appeal because Sanchez failed to make a timely objection and/or failed to press for a ruling on this issue.

---

[8] Even if the trial court erred, as analyzed below, any such error was harmless.

We do find this argument cognizable on appeal. "If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194.) Additionally, if the trial court inadvertently fails to rule on an objection, "the defendant must make some appropriate effort to obtain the … ruling." (*People v. Braxton* (2004) 34 Cal.4th 798, 813 [collecting cases]; *People v. Ramirez* (2006) 39 Cal.4th 398, 472 ["In order to preserve an issue for review, a defendant must not only request the court to act, but must press for a ruling."].) While there was no ruling on the record, Sanchez objected, Sanchez followed up on the objection, the trial court stated that it received the objection, and the trial court stated that it resolved the objection. As Sanchez objected and pressed for a ruling, this claim has not been forfeited.

However, we also find that the trial court did not err in allowing admission of this reference. As the jury was properly instructed pursuant to CALCRIM No. 371, "[i]f the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt." (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1223-1225; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102-103.) And here, while there was no ruling on the record, Sanchez referenced his prison term during what appears to be an attempt to discourage S.C. from coming to court. During this call, which was labeled "Track 15," Sanchez told S.C. that the next step is that "they" will want S.C. to go to court. Sanchez asked her if she was going to go, and she said yes but she was going to remain silent. In response, Sanchez repeatedly told S.C., "No." He also told S.C. that, previously, his "baby mama" went to court and did not say anything, but he still went to prison. Later in the call Sanchez again asked S.C. if she is going to court, S.C. again stated that she is, Sanchez again repeatedly said, "No," Sanchez reminded S.C. that he just told her what happened when his "baby mama" went to court, and Sanchez stated that the goal was to make sure he did not end up in prison.

In essence, Sanchez told S.C. that if she goes to court he will go to prison, which

is what happened previously and is something they want to avoid. The reference to the prior prison term was key to Sanchez's attempt to discourage S.C. from coming to court, and thus was relevant.

Moreover, any prejudicial effect was minimal. Sanchez separately admitted before the jury that he had multiple prior felonies, which suggests that he served time in jail or prison. Additionally, the trial court instructed the jury to "not consider from this evidence that the defendant has a bad character or is disposed to commit crime." And, we presume that the jury followed the trial court's instruction. (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Based on the foregoing, the trial court did not abuse its discretion in admitting the reference to Sanchez's prior prison term.[9]

### iii. Any Error in Allowing Questions Regarding a Sexual Relationship Between S.C. and Sanchez and Admitting Sanchez's Derogatory References to His Mother Was Harmless

During trial, the prosecutor asked numerous questions regarding the sexual relationship between Sanchez and S.C., a minor. Many of these questions were asked even after S.C. admitted that she would do anything to protect Sanchez, including running away from her dad and violating a court order. Additionally, in a jail call, Sanchez made derogatory statements about his mother, calling her a "b***h" and a manipulator.[10] Sanchez argues that allowing the prosecutor to ask those questions and

---

[9] Sanchez also argues that the prior prison term could not be used to impeach his credibility. However, as discussed above, it appears that the statement regarding Sanchez's prior prison term was admitted to show that Sanchez attempted to discourage S.C. from coming to court, not to impeach his credibility.

[10] The People argue that the claim regarding Sanchez's derogatory statements about his mother was forfeited. However, as with the claim above, Sanchez objected, Sanchez followed up on the objection, the trial court stated that it received the objection, and the trial court stated that it resolved the objection. Thus, this claim has not been forfeited. (*People v. Polk, supra,* 190 Cal.App.4th at p. 1194; *People v. Braxton*, *supra*, 34 Cal.4th at p. 813; *People v. Ramirez*, *supra*, 39 Cal.4th at p. 472.)

14.

failing to exclude the derogatory statements were errors that violated both state and federal law.

Even assuming error, any such error was harmless. As discussed above, the *Watson* standard of review applies, and it is not reasonably probable that Sanchez would have achieved a more favorable result had the above-mentioned errors not occurred.

Sanchez argues that the jury considered this a close case because they requested readbacks, because of the length of the deliberations, and because the jury initially deadlocked on the first degree murder charge. Sanchez further argues that, as this was a close case, had the above-described evidence been excluded, "it is reasonably likely the jury would have reached a more favorable outcome."

Sanchez is correct that the length of deliberations, requests for readbacks, and deadlocking are indications that a case is close. (See, e.g., *People v. Diaz* (2014) 227 Cal.App.4th 362, 385; *In re Hernandez* (2006) 143 Cal.App.4th 459, 476; *In re Martin* (1987) 44 Cal.3d 1, 51.) And here, the jury asked for readback of testimony, deliberated for over three days, and initially deadlocked on first degree murder. However, this was a murder trial that included numerous witnesses. Moreover, the jury informed the trial court which issue it was struggling with. The jury wrote two notes regarding difficulty reaching a verdict on first degree murder. The court provided additional instructions, and the next day the jury reached a verdict. That verdict included a finding that Sanchez was not guilty of first degree murder.[11] There is nothing before us suggesting that this was a close case as to self-defense (perfect or imperfect) or second degree murder. The length of deliberations, the notes from the jury, and the not guilty verdict on the count of first

---

[11] Sanchez argues that our Supreme Court has held that a hung jury is a more favorable result than a guilty verdict. While Sanchez is correct, *People v. Hendrix* (2022) 13 Cal. 5th 933, 947, footnote 6, the verdict on Sanchez's first degree murder charge was not guilty.

15.

degree murder strongly suggest that the jury did not convict Sanchez because they viewed him as a bad person.

Instead, it appears that the jury appropriately considered the evidence in reaching its verdict. (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899, 949 ["By failing to come to a verdict on two of the four alleged murders, the jury showed it had considered each count separately and thoughtfully and was not overcome by bias against, or hatred for, defendant."].) Sanchez admitted at trial that he shot and killed Correll after being insulted at a stoplight near the gas station. While Sanchez asserted that he did so in self-defense, there was an overwhelming amount of admissible evidence that Sanchez's version of events was fabricated.

First, Sanchez's story changed multiple times. Approximately two days after the incident, on a call with S.C., Sanchez stated that he "didn't do nothin'," and that they "found" the "strap … on the street." Sanchez also asked S.C. if she said anything regarding where they were, and that last he checked, he and S.C. were "over there by the bluffs." S.C. answered that she said they were at the gas station, and Sanchez responded "No, no, no. I don't remember - we were nowhere close to [the gas station]." Sanchez also stated that "they" did not have video showing that he was at the gas station. There was no mention of being followed or of Correll having a weapon. Additionally, at trial, Sanchez admitted that he was near the gas station and that he lied about finding the firearm.

After attending a hearing where he heard at least some of the evidence against him, Sanchez's story changed. On a jail call that occurred on July 13, 2021, Sanchez told S.C. what he "remembered" happening. According to Sanchez, on the day in question, he was taking a friend home, but he forgot that he had to pick up money from a different friend. So, near the gas station, he turned right and then made a U-turn. As he was typing in his friend's address, he dropped his phone. So, he pulled over to look for it. As he was looking for it, a woman complimented his vehicle. Sanchez then heard gunshots

16.

and ran back to his vehicle. Again, there was no mention of having been followed or of Correll having had a weapon.

Finally, at trial, after seeing all the evidence against him, Sanchez's story changed again. In that iteration, he was near the gas station, he had a gun, and he did shoot Correll, but he did so because he was being followed and he thought Correll was reaching for a weapon.

Second, Sanchez had felony convictions, and the jury was properly instructed, pursuant to CALCRIM No. 316, that these convictions could be used to in evaluating Sanchez's credibility. (Evid. Code, § 788.)

Third, Sanchez's story was at least partially contradicted by the testimony of N.S., a witness to the incident. At trial, Sanchez stated that one reason he believed he was being followed was that, at the intersection near the gas station, a vehicle failed to turn when the light turned green and instead waited at the light. Sanchez further alleged that, at this point, he was concerned for his safety. However, according to N.S., all three vehicles—N.S.'s vehicle, Sanchez's vehicle, and the vehicle carrying Correll—were stopped at the red light, and Sanchez accelerated, did a donut in the middle of the intersection, then went to the west side of the intersection, facing east. The light turned green for Sanchez's vehicle, and Sanchez went through the intersection and parked just past the gas station. The vehicle carrying Correll was in the left turn lane, and it turned left (east, towards the gas station) when the light turned green. Thus, there is testimony that the vehicle carrying Correll was waiting at a red light to turn, and the vehicle did not fail to turn when the light turned green. No evidence was presented suggesting that N.S. had a motive to lie, while Sanchez had a significant motive to lie.

Fourth, while Sanchez stated that Correll was holding a handle in his pocket and his hand started to leave his pocket before Sanchez pulled out his firearm, Correll's knife was still in his pocket even after Sanchez pulled out his firearm and shot Correll.

17.

Fifth, the evidence shows the bullet entered in "the back right side of the head, four inches from the right ear canal and located at 10:00 if one sees the right side of the head as if it were a clock face." It exited "at the left side of the neck … a little bit more towards the back of the neck than towards the front of the neck." This strongly suggests that Correll was not approaching or even facing Sanchez at the time he was shot.

Sixth, an expert testified that when individuals fear for their life, the "fight-or-flight" response is triggered. Signs that this response has been triggered can include heightened emotions, body trembling, sweating, dilated pupils, difficulty gathering thoughts, difficulty communicating, and rapid breathing. A sheriff's deputy who saw Sanchez less than 10 minutes after receiving a call regarding shots being fired testified that Sanchez appeared very calm and very collected. He was not shaking, sweating, trembling, or breathing extra hard, and he did not have any difficulty answering the deputy's questions, communicating with the deputy, or following the deputy's instructions. This is evidence suggesting that Sanchez did not in fact fear for his life.

Finally, Sanchez repeatedly attempted to dissuade S.C., who was in his vehicle at the time of the incident, from testifying at trial. As the jury was properly instructed pursuant to CALCRIM No. 371, the jury could use this conduct as evidence that Sanchez was aware of his guilt. (See *People v. Jackson*, *supra*, 13 Cal.4th at pp. 1223-1225; *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 102-103.) Moreover, while S.C. testified that she heard yelling coming from another vehicle while she and Sanchez were stopped at the light near the gas station, S.C. did not testify that that vehicle had been following S.C. and Sanchez.

Overall, the jury was presented with an overwhelming amount of admissible evidence showing that Sanchez was guilty of second degree murder.

In addition to this overwhelming evidence, Sanchez does not appear to argue that admission of the derogatory statements he made about his mother would, by themselves, be sufficient to warrant reversal of the conviction, nor do we find that they would be.

18.

Unfortunately, family strife is common, and Sanchez has not cited to any authority—and our research has revealed none—suggesting that referring to family members in a derogatory way would invoke an emotional reaction causing the jurors to punish Sanchez because of that reaction.

Finally, as to the questions the prosecutor asked regarding the sexual relationship between Sanchez and S.C., the trial court instructed the jury as follows: "You have heard evidence of [Sanchez's] relationship with [S.C.]. Do not consider from this evidence that [Sanchez] has a bad character or is disposed to commit crime." And, we presume that the jury followed the trial court's instruction. (*People v. Case*, *supra*, 5 Cal.5th at p. 32.)[12]

Therefore, even considering the potential cumulative effects of the alleged errors, for the reasons above, it is not reasonably probable that Sanchez would have achieved a more favorable result absent the errors. Accordingly, the alleged errors are harmless.

## II. The Trial Court Did Not Abuse Its Discretion in Denying Sanchez's Motion Pursuant to *Romero*

Sanchez contends the trial court erred in denying his motion to strike the prior strike conviction allegation pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). The People disagree, as do we.

### A. Additional Background

At the sentencing hearing on April 22, 2022, Sanchez made oral motions to dismiss the firearm enhancement, the prior serious felony conviction enhancement, and the prior strike conviction allegation. The court denied all three motions.

As to the motion to dismiss the firearm enhancement, the trial court ruled as follows:

---

[12] We note that the prosecutor did not introduce any direct evidence of a past sexual relationship between Sanchez and S.C. And while we may disapprove of the extensive question regarding the sexual relationship, in light of the jury instruction that nothing the attorneys say is evidence (CALCRIM No. 104), we further find any prejudice resulting therefrom to be harmless.

"As the prosecution said, the jury clearly rejected any self-defense claims, and the evidence was quite clear, and the fact -- the word call[o]us has been used that someone can react to a situation now that makes them upset or angry with a gun. This is why we have these enhancements. In addition, it is someone who wasn't allowed to have a gun, and it was a nothing situation that ended up in a tragedy for no reason other than [Sanchez] had a gun available and used it. So I don't think it is appropriate to strike the enhancement or to strike the punishment for the 12022.53(d)."

As to the motion to dismiss the prior serious felony conviction enhancement and the motion to dismiss the prior strike conviction allegation, the trial court ruled as follows:

"I have looked at his prior record, and even before he suffered that 422 conviction, which it appears actually occurred in 2016, the conviction was January of 2017, he had quite a criminal history before that, including as a juvenile, acts of violence, prior criminal threat as a juvenile, a prior attempted robbery as a juvenile, other offenses leading up to that, and then even after that 422 conviction in 2017, continued to violate the law.

"So I also don't think he is an appropriate candidate under … *Romero* to strike the 667(e) prior, and I don't think it is appropriate to strike the 667(a) prior for the same reasons in looking at his criminal history. This is a case where the victim was shot in the back of the head, according to the testimony. It is clear the victim was leaving the altercation, was not a threat, and was shot in cold blood."

### B. *Applicable Law and Standard of Review*

A trial court has discretion to dismiss a prior conviction alleged under the Three Strikes law if the dismissal is in furtherance of justice, "subject … to strict compliance with the provisions of section 1385." (*Romero*, *supra*, 13 Cal.4th at p. 504, citing § 1385, subd. (a).) "[T]he underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences." (*People v. Garcia* (1999) 20 Cal.4th 490, 500.) In exercising its discretion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as

20.

though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) These are "stringent standards." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

We review the denial of a motion to dismiss prior strike convictions for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) The Three Strikes law establishes that not dismissing a prior strike conviction is the "norm," and there is a "strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id*. at p. 378.) Abuse of discretion in failing to dismiss a prior strike conviction occurs in limited circumstances, such as where the trial court was not aware of its discretion; where the trial court considered impermissible factors; or where applying the Three Strikes law would produce an arbitrary, capricious, or patently absurd result under the specific facts of a particular case. (*Ibid.*) Additionally, abuse of discretion occurs when the trial court's findings of fact are not supported by substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) Substantial evidence is " 'evidence that is reasonable, credible, and of solid value.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; *People v. Reyes* (2023) 14 Cal.5th 981, 988.)

### C. Analysis

Sanchez argues that the trial court abused its discretion in denying his *Romero* motion because it inaccurately characterized the evidence. In denying the motion, the court relied in part, on the following facts: "[T]he victim was leaving the altercation, was not a threat, and was shot in cold blood." Sanchez argues that substantial evidence does not support these findings.

Substantial evidence supports the facts found by the trial court. To begin, as discussed at length above, there was an overwhelming amount of evidence that Sanchez's version of events, including that Sanchez believed Correll was a threat, was fabricated. Thus, the findings that Correll was not a threat and that Sanchez shot him in cold blood were supported by substantial evidence.

21.

Substantial evidence also supports the trial court's finding that Correll was shot as he was "leaving the altercation." Sanchez appears to read the trial court as finding that Correll was walking away, and then was shot in the back of the head. In context, this is not a fair reading of what the trial court found. Instead, the trial court was commenting on the fact that Correll was not a threat when Sanchez killed him. And, there is evidence of reasonable, credible, and of solid value supporting this finding. According to the coroner's testimony, the bullet entered "the back right side of the head, four inches from the right ear canal and located at 10:00 if one sees the right side of the head as if it were a clock face." The prosecutor also introduced an exhibit showing the trajectory of the bullet. This evidence shows that Correll was shot in the back of his head, and it strongly suggests that Correll was not approaching or even facing Sanchez at the time he was shot. Additionally, as discussed above, there was an overwhelming amount of evidence that Sanchez's version of events was fabricated. Thus, substantial evidence supports the conclusion that Correll was no longer actively engaged in the altercation at the time he was shot, or as the trial court phrased it, he was "leaving the altercation."[13]

Thus, the trial court's findings are supported by substantial evidence and Sanchez's argument fails. Sanchez has not overcome the strong presumption that a trial court's decision not to strike a prior strike conviction is rational and proper. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

### III. The Trial Court Did Not Abuse its Discretion in Denying Sanchez's Motion Pursuant to Section 1385

Sanchez contends that the trial court erred in refusing to strike the firearm and prior serious felony conviction enhancements. Again, the People disagree, as do we.

---

[13] While there may be some evidence to the contrary, the question before us is whether substantial evidence supports the trial court's findings, and it does.

22.

### A. *Applicable Law and Standard of Review*

On January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) went into effect (Stats. 2017, ch. 682, §§ 1-2), amending sections 12022.5 and 12022.53, and granting trial courts discretion pursuant to section 1385 to strike or dismiss certain firearm enhancements. (§§ 12022.5, subd. (c); 12022.53, subd. (h).) On January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill No. 81) went into effect (Stats. 2021, ch. 721, § 1), further amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

Section 1385, subdivision (c)(1), provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Section 1385, subdivision (c)(2), provides: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

A trial court's decision not to dismiss an enhancement pursuant to section 1385, subdivision (c), is reviewed for an abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.) A trial court abuses its discretion if it acts so irrationally or arbitrarily that no reasonable person could agree with its refusal to dismiss the prior conviction. (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.) Additionally, "[w]hen being sentenced, a defendant is entitled to decisions made by a court exercising informed discretion. [Citation.] A court acting while unaware of the scope of its discretion is understood to have abused it." (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

23.

### B. Analysis

Sanchez argues that the trial court abused its discretion in denying his motion to strike pursuant to section 1385 because "[i]t is reasonable to conclude from the absence of reference to the amendment to section 1385 … that neither the parties nor the court was aware the amended statute applied to this case."

To begin, we presume that the trial court was aware of and followed applicable law. (*People v. Moran* (1970) 1 Cal.3d 755, 762; *People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Moreover, the record does not support Sanchez's contention that the trial court and the parties were unaware that the amended section 1385 applied to this case. In asking the trial court to strike the firearm enhancement, Sanchez's trial counsel stated, "one of the things that the Court looks at under changes to 1385 is whether application of an enhancement could result in a sentence of more than 20 years, and certainly that would be the case here." The prosecutor subsequently argued that "regarding striking the enhancement and the changes under the law that they should be stricken if they are going to create a sentence that is over 20 years, that law contemplates if it is the enhancement alone that is going to make that sentence that length. That is simply not the case here."

As noted above, it was the most recent amendment that specified factors that the trial court must consider, and whether application of an enhancement could result in a sentence of more than 20 year is one of the new factors. (§ 1385, subd. (c)(2)(C).) As both parties argued whether this factor applied, the parties were clearly aware that the amended statute applied to this case, and they put the issue squarely before the trial court. There is nothing in the record suggesting that the trial court did not know of the amendment to section 1385. While Sanchez is correct that no other mitigating factors were discussed, that appears to be because trial counsel chose not to raise any of those factors.

Accordingly, Sanchez's argument that the trial court abused its discretion because it was not aware of the amendment to section 1385 fails.[14]

Sanchez also argues that the trial court abused its discretion because "[n]o evidence supports the finding that the victim was shot in the back of the head while 'leaving the altercation.' " As analyzed above, substantial evidence supports the facts found by the trial court.

## DISPOSITION

The judgment is affirmed.

SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DE SANTOS, J.

---

[14] As Sanchez's argument is based on the erroneous assumption that the trial court was not aware of the amendments to section 1385, we need not address whether there is a rebuttable presumption that enhancements should be dismissed unless the trial court finds that dismissal of the enhancements would endanger public safety. (See, e.g., *People v. Ponder* (2023) 96 Cal.App.5th 1042, 1050-1052, review granted Jan. 10, 2024, S282925.)

We also do not address Sanchez's argument, raised for the first time in his reply brief, that even if the trial court was aware of its discretion, it abused that discretion by not dismissing the enhancements because Sanchez would serve a term of 30 years to life even if both enhancements were dismissed. (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 842, fn. 21 ["The general rule is we do not address new arguments presented in a reply."].)

25.